IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | |
|---|---|
| MIA S., | |
| Plaintiff, | **8:21-CV-439** |
| vs. | |
| KILOLO KIJAKAZI, Acting Commissioner of Social Security, | **MEMORANDUM AND ORDER ON JUDICIAL REVIEW OF COMMISSIONER'S DENIAL OF BENEFITS** |
| Defendant. | |

Plaintiff Mia S.[1] seeks judicial review of the denial of her application for disability benefits by Defendant Commissioner of the Social Security Administration. Filing 1. Mia S. has moved for an order reversing the Commissioner's decision. Filing 15. In response, the Commissioner filed a motion to affirm the Commissioner's final decision denying disability benefits. Filing 18. For the following reasons, the Court grants the Commissioner's motion and denies Mia S.'s motion.

## I.     BACKGROUND

Mia S. was twenty-two years old on her amended alleged disability onset date of April 1, 2017, making her a younger individual under 20 C.F.R. § 416.968. Filing 9-2 at 26. She was twenty-five years old when she filed for disability insurance benefits with the Social Security Administration and twenty-six at the time of her administrative hearing. Filing 9-2 at 11, 32. She has at least a high school education, Filing 9-2 at 26, and has worked as a child care provider,

---

[1] The Court will refer to Plaintiff by first name and last name first initial to protect her privacy.

production line worker, cashier, school bus aide, and in food service. Filing 9-2 at 39-40; Filing 9-3 at 10-11; Filing 10-2 at 122.

## A.    Procedural History

On November 25, 2019, Mia S. filed a claim for disability insurance benefits under Title II of the Social Security Act, 42 U.S.C §§ 401 *et seq.*, and supplemental security income benefits under Title XVI of the Social Security Act. 42 U.S.C §§ 1381 *et seq.*; Filing 9-2 at 11. Mia S. alleges an amended disability-onset date of April 1, 2017. Filing 9-2 at 11. Mia S.'s initial disability report alleges diabetes with neuropathy in eyes limiting her ability to work. Filing 9-3 at 2. The Social Security Administration initially denied her claim on April 30, 2020, Filing 9-3 at 11, and denied it upon reconsideration on July 28, 2020. Filing 9-3 at 26. Mia S. then requested an administrative law judge (ALJ) review that denial. Filing 9-2 at 11. On November 30, 2020, the ALJ held an administrative hearing, Filing 9-2 at 32-63, and denied her claim on December 30, 2020. Filing 9-2 at 8-27. Mia S. appealed the ALJ's decision to the Social Security Appeals Council, which found no reason to change the ALJ's decision and sent a notice of its denial of Mia S.'s request for review on September 17, 2021. Filing 9-2 at 2-4. Mia S. timely filed this present action requesting this Court review the denial of her claim for disability insurance benefits. Filing 1; *see* 42 U.S.C. § 405(g).

## B.    ALJ Hearing

A hearing before an ALJ was held on November 30, 2020. Filing 9-2 at 32-63. At the hearing, Mia S.'s attorney asserted that Mia S. has significant problems with dizziness, her vision, "floaters in her eyesight," chronic headaches, leg edema from kidney issues, diarrhea, and diabetic neuropathy. Filing 9-2 at 37-38. Mia S. testified her visual impairments are the biggest issue, and that she deals with visual problems every day. Filing 9-2 at 41-42. She stated it was difficult to

read and that the right eye was worse than the left eye at the time of the hearing. Filing 9-2 at 42. Mia S. alleged the visual issues made it difficult to work because there will be days where she is "feeling blind in one eye" and would end up calling out of work regularly because the "other eye has to work 10 times harder" and ends up giving her a headache. Filing 9-2 at 43. She reported living with family and staying at home most of the time because of depression and visual issues. Filing 9-2 at 43-44.

Mia S. testified that she could only stand for "a good 10 or 15 minutes" before needing to sit down and elevate her feet. Filing 9-2 at 47. She also claimed to be able to use her hands to write or work for only "about 10 to 15 minutes" before getting a "pins and needles sensation" in her fingers or hands. Filing 9-2 at 47. She reported swelling in her legs, chronic diarrhea, and back pain from kidney issues. Filing 9-2 at 49-50. If at work, Mia S. said she would need to visit the bathroom every half hour and would be in the bathroom "for hours on end" throughout the day. Filing 9-2 at 52. Mia S. testified that she can only lift about 10 pounds. Filing 9-2 at 53. Finally, she reported having depression from family trauma and "everything going on with COVID" but was not seeing a doctor nor taking medication for it. Filing 9-2 at 54-55.

Susan Johnson, a vocational expert (VE), testified at the hearing to help the ALJ determine if work exists in the national economy for Mia S. Filing 9-2 at 56-60. First, the ALJ asked the VE if work would exist for a hypothetical person of Mia S.'s age, education, and past work experience who is limited to light work and should avoid all exposure to unprotected hazards, should not operate a motor vehicle, and is limited to jobs with "occasional, precise near acuity." Filing 9-2 at 57. The VE responded that regarding clean work there would be "some need for precise, near acuity measurements" and that job numbers "would be reduced is what I'm trying to say." Filing 9-2 at 57. The ALJ then stated that if job numbers "were reduced, then give me the estimate

including a reduction in numbers." Filing 9-2 at 58. Accordingly, the VE provided three jobs: "cleaner" (323.687-014)[2], 220,000 available jobs with a 20% reduction; "ticket seller" (211.467-030), 16,290 available jobs with a 10% reduction; and "advertising materials distributor" (230.687-010), 34,475 available jobs with no reduction needed. Filing 9-2 at 58.

Next, the ALJ asked a second hypothetical, identical to the first, but added another limitation of "frequent depth perception" and asked the VE if the three prior cited jobs would remain. Filing 9-2 at 59. The VE replied that an individual under the second hypothetical could still perform the ticket seller occupation but added the other two occupations would be precluded. Filing 9-2 at 59. As replacements, the VE provided the jobs of "counter clerk" (249.366-010), with 9,500 available jobs, and "furniture rental clerk" (295.357-018), with 58,289 available jobs. Filing 9-2 at 58.

The VE also testified that most employers allow up to one absence per month and tolerate up to ten percent time off task. Filing 9-2 at 60. Finally, the VE testified that employers would not tolerate a work limitation in which an employee needed to elevate their legs to waist level outside of normally allotted breaks. Filing 9-2 at 60. When the ALJ asked the VE if the VE's testimony was consistent with information contained in the DOT, the VE responded, "[y]es, your honor." Filing 9-2 at 60.

### C.    Medical Records and Evidence

Prior to Mia S.'s alleged onset date of April 1, 2017, she primarily saw Dr. Rachel Johnson, M.D., for primary care relating to her type 1 diabetes mellitus and for various gastrointestinal issues. Filing 10-1 at 131. Mia S. has primarily seen Dr. Mark Emig, M.D., for her eye issues.

---

[2] The Social Security Administration primarily relies on the Dictionary of Occupational Titles (DOT) for gathering information about occupations in the national economy. Every occupational title in the DOT has a corresponding nine-digit identification number. *How to Find an Occupational Title and Code*, Information Technology Associates (Apr. 11, 2020), https://occupationalinfo.org/front_580.html.

Filing 10-1 at 44. On May 16, 2017, Mia S. saw Dr. Emig for a follow-up check of her eyes. Filing 10-1 at 44. In his assessment, Dr. Emig opined:

> 1. Type 2 Diabetes Mellitus With Moderate Nonproliferative Diabetic Retinopathy Without Macular Edema, Left. Eye., Stable, Ell 3392
> 2. Type 2 Diabetes Mellitus With Proliferative Diabetic Retinopathy Without Macular Edema, Right Eye, Stable, Ell.3591
> 3. Lattice Degeneration Of Retina, Bilateral., Stable, H35.413
> 4. Open angle with borderline findings, low risk, bilateral. low risk, Stable, H40.013

Filing 10-1 at 42. Dr. Emig noted that Mia S. "was examined today and found to be stable under the present mode of management." Filing 10-1 at 43. On August 14, 2017, Mia S. had an appointment with Dr. Emig. Filing 10-1 at 38. There, Dr. Emig found that Mia S.'s symptoms were stable, no injections were needed, and that Mia S. should return in four months. Filing 10-1 at 38.

On October 5, 2017, Mia S. saw Dr. Johnson for a variety of concerns, including gastrointestinal issues. Filing 10-1 at 128. Dr. Johnson noted that Mia S. "has been inconsistent with insulin use lately." Filing 10-1 at 128. The records from this visit also indicated that Mia S. took a job at a daycare where she managed twelve toddlers by herself, though she only "worked a couple of weeks" because it was too stressful. Filing 10-1 at 128. Mia S. reported no gastrointestinal issues since quitting the daycare job. Filing 10-1 at 128.

On December 19, 2017, Mia S. saw Dr. Emig for an eye appointment. Filing 10-1 at 32. Dr. Emig discussed Mia S.'s diabetes with her—who responded that her "kidneys [were] doing okay"—and noted that there was "[n]o neuropathy at th[at] time." Filing 10-1 at 34. Mia S. also discussed her financial difficulties relating to paying for her medications, and Dr. Emig "[s]tressed the importance of follow up care and taking care of [her] diabetes." Filing 10-1 at 34. Dr. Emig noted the plan to see Mia S. back in four months. Filing 10-1 at 34.

On January 24 and March 28, 2018, Mia S. saw gastroenterology providers for complaints of diarrhea and constipation. Filing 10-1 at 119, 122. During the January 24 visit, Mia S. stated she was "working as a server in a restaurant and ha[d] to move a lot." Filing 10-1 at 122. During the March 28 visit, Mia S. reported that she "ha[d] been more active with work and school, and [was] working toward a psychology degree." Filing 10-1 at 119. The records also note that "last fall when her A1c was 12.9, she had been out of insulin and missing doses. Since that time, she reestablished with her primary care physician and has refills on insulin and reports compliance with it." Filing 10-1 at 119. On April 5, 2018, Mia S. visited Dr. Emig. Filing 10-1 at 28. Dr. Emig opined that Mia S.'s diabetic retinopathy remained stable. Filing 10-1 at 30. Mia S. had a follow up visit with Dr. Emig on August 29, 2018, during which Dr. Emig discussed Mia S.'s diabetic retinopathy and explained Mia S.'s "blurred vision up close and photophobia." Filing 10-1 at 24, 26.

On February 27, 2019, Mia S. visited Dr. Johnson for various issues, including leg swelling. Filing 10-1 at 115. Mia S. reported her legs had edema for about the last week, which improved with elevating her legs at night. Filing 10-1 at 116. Mia S. alleged hurting her foot in September 2018 after "stepping off a ride" and feeling "something pop." Filing 10-1 at 116. Mia S. said she was not experiencing pain with the foot but was concerned because the foot "seemed to be misshapen." Filing 10-1 at 116.  Dr. Johnson noted "1+ pitting edema up to mid-calf" and "valgus deformity of her left midfoot." Filing 10-1 at 117. Dr. Johnson planned for x-rays of Mia S.'s foot at a later date due to the x-ray tech not being available during the appointment. Filing 10-1 at 117. Dr. Johnson also indicated she had not seen Mia S. for her diabetes since October 2017. Filing 10-1 at 115. Mia S. reported financial issues and stated she was "currently working part-time at Immanuel while serving food," and "was previously in school but had to stop due to

financial reasons." Filing 10-1 at 115. Dr. Johnson opined that Mia S.'s diabetes was poorly controlled, and she referred Mia S. to social work for financial and insurance counseling due to lack of insurance. Filing 10-1 at 117.

On March 5, 2019, Mia S. saw Dr. Johnson for a follow up on her diabetes. Filing 10-1 at 110. Mia S. reported that she had "some improvement" in lower extremity edema. Filing 10-1 at 111. On exam, Mia S. had "2+ edema up to [her] mid-calf bilaterally." Filing 10-1 at 111. For the edema, Dr. Johnson recommended a trial of compression stockings and noted she would like nephrology input as well. Filing 10-1 at 111. Dr. Johnson also stressed the importance of blood sugar control to prevent worsening kidney function. Filing 10-1 at 111.

On March 15, 2019, Mia S. saw a provider in nephrology. Filing 10-1 at 106. On exam, Mia S. had 2+ leg swelling and edema. Filing 10-1 at 108. The provider diagnosed Mia S. with hypertension and nephrotic syndrome likely due to long-standing type 1 diabetes mellitus. Filing 10-1 at 108. The provider also noted a history of hypothyroidism, and that Mia S. was currently on levothyroxine to address this. Filing 10-1 at 108. The provider planned additional workups, increased lisinopril and furosemide, and encouraged thirty minutes of aerobic exercise. Filing 10-1 at 108-09.

On March 21, 2019, Mia S. saw an orthopedist for evaluation of her left foot. Filing 10-1 at 2. Mia S. described her pain as a "dull ache" with minimal discomfort and rated the severity of her pain at one out of ten. Filing 10-1 at 2. She was mostly concerned with the "change in shape of her foot." Filing 10-1 at 2. Mia S. explained insurance difficulties and the inability to afford her insulin for a while. Filing 10-1 at 2. However, she was "working towards assistance and [was] now part of a program to receive her insulin." Filing 10-1 at 2. Before receiving assistance, she had been "rationing her insulin" and her blood sugars were "usually in the 300 range." Filing 10-1 at

2. After receiving assistance, Mia S. noted her blood glucose levels are "better controlled" and between the "80 to 150 range." Filing 10-1 at 2. On exam, Mia S. reportedly had "1-2+ pitting edema of the lower extremity." Filing 10-1 at 5. The orthopedist's assessment noted various displaced fractures with malunion in her left foot, type 1 diabetes with neuropathy, and "[s]ubluxation of first TMT joint of left foot." Filing 10-1 at 5. The orthopedist opined that Mia S. did not have significant instability in her foot but wanted to continue monitoring it over time. Filing 10-1 at 5. Moreover, she appeared to have "protective sensation intact but ha[d] some diminished sensation to the 4.56 monofilament," and also had "the beginnings of some neuropathy." Filing 10-1 at 5. The orthopedist also noted that Mia S. was working on getting Medicaid. Filing 10-1 at 6.

On March 25, 2019, Mia S. saw Dr. Johnson for a follow-up. Filing 10-1 at 104. There, Dr. Johnson noted that Mia S.'s leg swelling had improved. Filing 10-1 at 105. She had "trace pitting edema of feet but minimal edema above [her] ankles," which was "much improved" as compared to Mia S.'s last appointment. Filing 10-1 at 105. Dr. Johnson noted that Mia S. still had not submitted tax returns to pharmacy assistance to get discounts on insulin and was not consistently taking her mealtime insulin because she did not regularly eat meals due to being too busy. Filing 10-1 at 104. Mia S. stated she was too busy to eat because she was "trying to move, busy with her job, planning a birthday party for her sister, [and had] a lot going on with her boyfriend." Filing 10-1 at 104. Mia S. reported being denied Medicaid. Filing 10-1 at 104. She had not met with "social worker Karen" and had "missed a couple calls from her." Filing 10-1 at 104. She planned to meet with an insurance worker but did not know with whom specifically or what company it would be with. Filing 10-1 at 104.

On April 19, 2019, Mia S. visited Dr. Johnson for a follow-up. Filing 10-1 at 99. Mia S. reported feeling dizzy and getting headaches after taking lisinopril, which was "impacting her work in food service at Immanuel." Filing 10-1 at 99. She also stated that her leg swelling had much improved. Filing 10-1 at 99. She was still working on getting financial assistance. Filing 10-1 at 100. Dr. Johnson noted that Mia S. exhibited edema around her ankles, but it had much improved. Filing 10-1 at 100.

On May 10, 2019, Mia S. saw a provider in nephrology. Filing 10-1 at 95. Mia S. reported leg swelling but that it had "improved" since starting Lasix. Filing 10-1 at 95. On exam, she had 2+ swelling and edema. Filing 10-1 at 97. The provider opined a kidney biopsy was warranted. Filing 10-1 at 97. Mia S. had the left kidney biopsy on May 16, 2019. Filing 10-1 at 94.

Mia S. visited Dr. Emig for a complete eye exam on June 6, 2019. Filing 10-1 at 17. Dr. Emig discussed neovascularization in the left eye and recommended "PRP laser OS to treat the new growth of blood vessels." Filing 10-1 at 20. Mia S. elected to proceed with the surgery. Filing 10-1 at 20.

On July 11, 2019, social worker Karen Backus attempted to call Mia S., but she did not answer. Filing 10-1 at 93. Ms. Backus left a voicemail informing Mia S. that her file for financial assistance had been closed because she did not submit verification documentation by the deadline. Filing 10-1 at 93. Accordingly, Mia S. would need to re-apply for assistance. Filing 10-1 at 93.

On July 18, 2019, Mia S. saw Dr. Emig for a post-op exam. Filing 10-1 at 12. Dr. Emig stated that her diabetic retinopathy appeared stable after the surgery and advised she maintain good blood sugar control. Filing 10-1 at 14. During an appointment on October 17, 2019, Dr. Emig explained Mia S.'s right eye was stable after laser treatment and recommended additional laser

treatment in her left eye due to the amount of neovascularization present. Filing 10-1 at 10. Mia S. elected to proceed with pan retinal photocoagulation in her left eye. Filing 10-1 at 10.

On January 28, 2020, Mia S. completed a daily activities and symptoms report. Filing 9-6 at 38. She alleged only being able to stand for twenty-five minutes at a time and sit for twenty-five minutes at a time. Filing 9-6 at 39. She said she was "not able to do certain tasks" and felt "slow and sluggish at times." Filing 9-6 at 40. She alleges getting headaches once a week and that her feet and palms hurt every day. Filing 9-6 at 40. Describing her hobbies, Mia S. stated that she tries "to read and write that takes up most of my day." Filing 9-6 at 39. Regarding the types of errands that she regularly does, Mia S. said she goes "out to job interviews and [she] goes to the store with [her] dad [but] otherwise [she is] in the house." Filing 9-6 at 39. She explained she stopped going to college because she "can't use [her] computer to see," and "walking long distances [on campus] makes [her] feet ache." Filing 9-6 at 41. Finally, Mia S. explained that she does not eat much because of her depression and only eats lunch and dinner "most of the time." Filing 9-6 at 38.

Mia S. visited Dr. Emig on March 20, 2020, and on April 27, 2020. Filing 10-2 at 74, 78. During both visits, Mia S. reported continued issues with her left eye. Filing 10-2 at 74, 78. Dr. Emig discussed the need for surgical treatment but noted delays in scheduling due to COVID-19. Filing 10-2 at 76, 80. On May 11, 2020, Mia S. was cleared for surgery and, during this pre-operative clearance, reported that her diabetes management was "going well" and that she had "overall been feeling well recently." Filing 10-2 at 16.

On May 19, 2020, Dr. Emig performed "[p]ars plana vitrectomy with membrane peeling" and "[e]ndolaser" procedures on Mia S.'s left eye. Filing 10-2 at 63. During a follow-up on May 27, 2020, Dr. Emig reported a vitreous hemorrhage in Mia S.'s left eye. Filing 10-2 at 71.

On June 4, 2020, Mia S. went to the emergency room for a headache and left eye pain. Filing 10-2 at 8. Mia S. reported still working "in food service at Immanuel." Filing 10-2 at 10. On June 10, 2020, Mia S. filled out a disability report where she stated her left eye was getting worse. Filing 9-6 at 46. On June 22, 2020, during a visit with Dr. Johnson for primary care, Mia S. reported being in the process of applying for financial assistance. Filing 10-3 at 12.

On June 25, 2020, Mia S. visited Dr. Emig. Filing 10-2 at 65. Mia S. reported a "spot" in her left eye, which Dr. Emig noted was caused by the vitreous hemorrhage. Filing 10-2 at 67. Dr. Emig noted he would "continue to monitor and discuss surgical intervention in the future, if [the] blood does not clear." Filing 10-2 at 67.

On July 13, 2020, Mia S. completed a function report. Filing 9-6 at 52. Mia S. wrote that she had diabetic retinopathy that made it hard to see, and that she often had periods of time when her vision "goes blurry and [she] can't see." Filing 9-6 at 52. Describing her hobbies and interests, Mia S. said she loved to read and write, and liked chess and other games. Filing 9-6 at 56. She read daily but stated she used to "[r]ead more than [she is] able to now." Filing 9-6 at 56. She reported diabetic nerve pain in her feet and hands, which made it difficult to sleep. Filing 9-6 at 53. She also alleged difficulty to grasp things because of the pain in her hands. Filing 9-6 at 57.

On September 5, 2020, Mia S. was admitted into the emergency room for dizziness, abdominal pain, and nausea. Filing 10-3 at 18. On exam, she had 1+ pitting edema in both legs. Filing 10-3 at 22. The reason for hospitalization was acute kidney injury thought to be due to "gastroenteritis" from what Mia S. believed to be food poisoning. Filing 10-3 at 31.

On September 11, 2020, Mia S. visited Dr. Emig. Filing 10-2 at 89. Dr. Emig opined her vitreous hemorrhage was "improving" and that both eyes appeared "to be stable s/p laser." Filing 10-2 at 91. During a visit on September 19, 2020, Dr. Emig noted a "new subhyaloid heme OD

(same appearance as heme OS)." Filing 10-2 at 88. Dr. Emig planned to monitor and would consider surgical treatment if there was no improvement in a month. Filing 10-2 at 88.

On October 27, 2020, Mia S. visited Dr. Johnson for primary care. Filing 10-5 at 3. Mia S. reported her leg swelling was "so much better" since resuming lisinopril and Lasix. Filing 10-5 at 3. On November 19, 2020, Dr. Johnson provided primary care opinions concerning Mia S.'s medical impairments and limitations. Filing 10-4 at 40-44. Dr. Johnson opined that Mia S. could sit for ten minutes at a time, stand for ten minutes at a time, stand or work for less than two hours in a workday, and sit for about two hours in a workday. Filing 10-4 at 41. Dr. Johnson recommended a limitation be included which would allow Mia S. to elevate her legs while sitting. Filing 10-4 at 42. Dr. Johnson also noted likely troubles with Mia S.'s vision going forward and explained that repeated tasks with her hands and feet would be difficult due to neuropathy pain. Filing 10-4 at 43.

On November 20, 2020, Mia S. had an appointment via telephone with a provider in nephrology. Filing 10-5 at 9. She had "generally been well except for intermittent leg swelling over the last few months." Filing 10-5 at 9. These records also note that Mia S. was still "working in food service at Immanuel." Filing 10-5 at 11.

On February 18, 2020, Mia S. had an appointment with Elizabeth Morell, Ph.D., an after a psychological consultative example, Dr. Morell provided opinion evidence.  Filing 10-1 at 236-39. Dr. Morell opined that Mia S. had no restrictions in activities of daily living due to mental health; had no difficulties maintaining social functioning; had the ability to sustain concentration and attention needed for task completion; could carry out short and simple instructions under ordinary supervision; and could adapt to changes in her environment. Filing 10-1 at 240.

### D.      The ALJ's Findings

An ALJ engages in a five-step analysis to determine whether a claimant is disabled.

*Grindley v. Kijakazi*, 9 F.4th 622, 628 (8th Cir. 2021) (citing *Perks v. Astrue*, 687 F.3d 1086, 1091

(8th Cir. 2012)).

> During the five-step process, the ALJ considers (1) whether the claimant is
> gainfully employed, (2) whether the claimant has a severe impairment, (3) whether
> the impairment meets the criteria of any Social Security Income listings, (4)
> whether the impairment prevents the claimant from performing past relevant work,
> and (5) whether the impairment necessarily prevents the claimant from doing any
> other work.

*Goff v. Barnhart*, 421 F.3d 785, 790 (8th Cir. 2005) (quoting *Eichelberger v. Barnhart*, 390 F.3d

584, 590 (8th Cir. 2004)). The ALJ must continue the analysis until the claimant is found not to be

disabled at steps one, two, four or five, or is found to be disabled at steps three or five. *See* 20

C.F.R. § 404.1520(a).

At step one, the ALJ will find the claimant not to be disabled if he or she is engaged in

substantial gainful activity. 20 C.F.R. § 404.1520(a)(4)(i). Substantial gainful activity is work

activity that is both substantial and gainful. 20 C.F.R. § 404.1572. Substantial work is defined as

"work activity that involves doing significant physical or mental activities." 20 C.F.R.

§ 404.1572(a). Gainful activity is defined as "work activity that you do for pay or profit." 20 C.F.R.

§ 404.1572(b). Here, the ALJ determined Mia S. had not engaged in substantial gainful activity

since her alleged onset date of April 1, 2017. Filing 9-2 at 14.

At step two, the ALJ will determine if the claimant has a severe impairment or a

combination of severe impairments. 20 C.F.R. § 404.1520(a)(4)(ii). An impairment is "severe" if

it limits the claimant's ability to perform basic work activities. 20 C.F.R. § 404.1520(c). The ALJ

determined Mia S. had the following severe impairments: diabetes mellitus with diabetic

retinopathy; and residuals of left foot fractures. Filing 9-2 at 14.

13

At step three, the ALJ then must determine whether the impairments meet the criteria set forth in a list of impairments provided by the Social Security Administration. *See* 20 C.F.R. § 404.1520(a)(4)(iii); 20 C.F.R. § Pt. 404, Subpt. P, App. 1. If the claimant's severe impairments meet or are equal to one or more of the listed impairments, the ALJ must find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(iii). Otherwise, the ALJ will proceed to the next step. *Id.* Here, the ALJ determined that none of Mia S.'s severe impairments met or were medically equal to the severity of any of the listed impairments. Filing 9-2 at 17.

At step four, the ALJ must determine the claimant's residual functional capacity (RFC) and assess the claimant's past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv). A claimant's RFC is the extent to which a claimant can engage in physical and work activities despite the claimant's medical limitations. 20 C.F.R. § 404.1545(a). "A disability claimant has the burden to establish her RFC." *Eichelberger*, 390 F.3d at 591 (citing *Masterson v. Barnhart*, 363 F.3d 731, 737 (8th Cir. 2004)). "The ALJ determines a claimant's RFC based on all relevant evidence, including medical records, observations of treating physicians and others, and the claimant's own descriptions of his or her limitations." *Id.* Here, the ALJ concluded:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) and 416.967(b) except she can never work around hazards (such as unprotected heights and moving mechanical parts); and never operate a motor vehicle. She can perform jobs requiring occasional precise near acuity and frequent depth perception.

Filing 9-2 at 17. With consideration to the claimant's RFC, the ALJ will then determine if the claimant is still able to do his or her past relevant work. 20 C.F.R. § 404.1520(a)(4)(iv); *see* 20 C.F.R. § 404.1560(b). "Past relevant work" is work performed by the claimant within the last fifteen years or fifteen years prior to the date that disability must be established. *See* 20 C.F.R. § 404.1565(a); 20 C.F.R. § 416.965(a). If the claimant is able to perform past relevant work, the ALJ

will find the claimant to be not disabled. *Id.* In the present action, the ALJ determined Mia S. was not able to perform any past relevant work. Filing 9-2 at 24.

At step five, if the ALJ determines the claimant is not able to do past relevant work, the burden of proof shifts to the ALJ to show the claimant "retains the RFC to do other kinds of work, and, second that other work exists in substantial numbers in the national economy that the claimant is able to perform." *Goff*, 421 F.3d at 790 (quoting *Eichelberger*, 390 F.3d at 590). However, the burden of proof remains with the claimant to prove her disability and her RFC. *Id.* (quoting *Stormo v. Barnhart*, 377 F.3d 801, 806 (8th Cir. 2001)). If it is not shown that a significant number of jobs exist, the ALJ must find the claimant to be disabled. 20 C.F.R. § 404.1520(a)(4)(v). The ALJ may have a VE testify at the administrative hearing. 20 C.F.R. § 404.1566(e). The role of the VE is "to take into account medical limitations, including opinions as to work time limits, and offer an opinion on the ultimate question whether a claimant is capable of gainful employment." *Swedberg v. Saul*, 991 F.3d 902, 905 (8th Cir. 2021) (quoting *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995)). Here, the ALJ concluded that Mia S. retains the RFC to do other kinds of work, and that other work exists in significant numbers in the national economy for Mia S., such as a ticket seller, counter clerk, and furniture rental clerk. Filing 9-2 at 26-27. Therefore, considering Mia S.'s age, education, work experience, and RFC, the ALJ concluded that a finding of "not disabled" was appropriate at step five after determining Mia S. was capable of making a successful adjustment to other work that exists in significant numbers in the national economy.

## II.    DISCUSSION

### A.    Standard of Review

Upon review, the Court must determine if a denial of benefits by the Commissioner is supported by substantial evidence on the record as a whole. *Lucus v. Saul*, 960 F.3d 1066, 1068

(8th Cir. 2020). "Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Teague v. Astrue*, 638 F.3d 611, 614 (8th Cir. 2011) (quoting *Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008)). Courts should "defer heavily to the findings and conclusions of the Social Security Administration," *Hurd v. Astrue*, 621 F.3d 734, 738 (8th Cir. 2010)), and should not reverse the Commissioner's decision simply because the Court would have decided differently. *Wildman v. Astrue*, 596 F.3d 959, 964 (8th Cir. 2010)). "If, after reviewing the record, the court finds it is possible to draw two inconsistent positions from the evidence and one of those positions represents the ALJ's findings, the court must affirm the ALJ's decision." *Perkins v. Astrue*, 648 F.3d 892, 897 (8th Cir. 2011) (quoting *Medhaug v. Astrue*, 578 F.3d 805, 813 (8th Cir. 2009)). Moreover, even if error did occur, "reversal of an ALJ's decision is not required if an error was harmless, meaning '[t]here is no indication that the ALJ would have decided differently' if the error had not occurred." *Grindley*, 9 F.4th at 629 (alteration in original) (quoting *Van Vickle v. Astrue*, 539 F.3d 825, 830 (8th Cir. 2008)).

### B.    Analysis

Mia S. raises four grounds for vacating the ALJ's decision to deny her disability benefits. First, Mia S. asserts the ALJ did not properly consider her subjective complaints when developing her RFC assessment. Second, Mia S. argues the ALJ should have ordered additional examinations to resolve inconsistencies with the medical records. By failing to do so, according to Mia S., the ALJ did not fully and fairly develop the record, rendering the evidence insufficient to find Mia S. not disabled. Third, Mia S. claims the ALJ failed to resolve apparent conflicts between the VE testimony and information contained in the DOT. By not resolving these apparent conflicts, Mia S. asserts the VE testimony does not constitute substantial evidence that the ALJ could rely upon at step five.  Finally, Mia S. contends that the ALJ who adjudicated her claim was unlawfully

16

appointed because the former acting commissioner who appointed the ALJ was without power to do so.

> 1.   *The ALJ Properly Considered Mia S.'s Subjective Complaints*

Mia S. alleges the ALJ improperly discounted Mia S.'s credibility regarding her subjective complaints of pain when developing the record. When considering subjective complaints of pain, an ALJ "must consider objective medical evidence, the claimant's work history, and other evidence relating to (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) precipitating and aggravating factors; (4) the dosage, effectiveness, and side effects of medication; and (5) the claimant's functional restrictions." *Schwandt v. Berryhill*, 926 F.3d 1004, 1012 (8th Cir. 2019) (citing *Polaski v. Heckler*, 739 F.2d 1320, 1322 (8th Cir. 1984)); *see also* 20 C.F.R. § 404.1529(c). These factors are commonly referred to as the *Polaski* factors. Importantly, "an ALJ need not explicitly discuss each [*Polaski*] factor." *Id.* (citing *Buckner v. Astrue*, 646 F.3d 549, 558 (8th Cir. 2011)). Moreover, an ALJ "may decline to credit a claimant's subjective complaints 'if the evidence as a whole is inconsistent with the claimant's testimony.'" *Id.* (quoting *Julin v. Colvin*, 826 F.3d 1082, 1086 (8th Cir. 2016)). However, an ALJ must not reject a claimant's subjective statements about the intensity and persistence of pain solely because of inconsistency with the objective medical records. 20 C.F.R. § 404.1529(c)(2). Upon review, courts will defer to the ALJ's evaluations of a claimant's credibility provided that the determination is "supported by good reasons and substantial evidence," *Smith v. Colvin*, 756 F.3d 621, 625 (8th Cir. 2014) (quoting *Cox v. Barnhart*, 471 F.3d 902, 907 (8th Cir. 2006)), and "even if every [*Polaski*] factor is not discussed in depth." *Id.* (quoting *Dunahoo v. Apfel*, 241 F.3d 1033, 1038 (8th Cir. 2001)).

Mia S. first argues the ALJ relied solely on the inconsistencies between Mia S.'s subjective statements regarding the intensity and persistence of her pain and the objective medical records to discredit her credibility. *See* Filing 9-2 at 14-25. This argument is not supported by the record. The ALJ extensively discussed the history and nature of Mia S.'s impairments by discussing her medical records; work history; daily activities; the duration, frequency, and intensity of her impairments; precipitating and aggravating factors; the dosage, effectiveness, and side effects of her prescribed medications; and her functional restrictions. *See* Filing 9-2 at 14-25. Contrary to Mia S.'s assertion, therefore, the ALJ fulfilled his obligation by discussing most of the required factors from *Polaski* when developing the record. *See* Filing 9-2 at 14-25; *see Polaski*, 739 F.2d at 1322.

Mia S. also argues the ALJ erred by using her insurance and financial difficulties as a reason to find her less credible. SSA regulations recognize that a claimant's subjective complaints should not be discredited solely because the claimant cannot afford treatment. *See* SSR 18-3P, 2018 WL 4945641 (stating an acceptable reason for not following prescribed treatment is when "[t]he individual is unable to afford prescribed treatment, which he or she is willing to follow, but for which affordable or free community resources are unavailable"). While the ALJ noted Mia S.'s noncompliance with treatment, he did not use her financial difficulties as a basis to doubt her credibility. Filing 9-2 at 23. Instead, the ALJ noted the noncompliance and acknowledged it was "due at least in part to lack of insurance and financial reasons," but added, "Dr. Johnson noted multiple times that the claimant failed to complete the application process for assistance, which would have aided her in obtaining medication and seeing specialists." Filing 9-2 at 23-24. Thus, the ALJ did not discredit Mia S.'s subjective complaints due to her financial troubles. Instead, the ALJ noted Mia S.'s failure to file her application for financial assistance, which would have helped

18

her obtain medical treatment. *See* SSR 16-3p, 2017 WL 5180304 (stating that ALJs will "consider an individual's attempts to seek medical treatment and to follow treatment" when evaluating whether the intensity and persistence of the symptoms affect the ability to perform work activities). For example, in March 2019, Mia S. still had not submitted her tax returns to pharmacy assistance to get discounts on insulin and was not consistently taking her mealtime insulin because she was "trying to move, busy with her job, planning a birthday party for her sister, [and had] a lot going on with her boyfriend." Filing 10-1 at 104. Additionally, in July 2019, Mia S.'s file for financial assistance had been closed because she did not submit verification documentation by the deadline. Filing 10-1 at 93. Therefore, the ALJ did not err when noting Mia S.'s noncompliance with prescribed treatment because it seemed at least partially to be by Mia S.'s own doing.

Mia S. further argues the ALJ improperly considered the nature and severity of her edema, visual limitations, and neuropathy-related limitations when considering her subjective symptoms. Nothing in the record provides a basis for the Court to believe this to be the case. Regarding Mia S.'s edema, the ALJ noted that, on multiple occasions, the medical records indicated the edema improved with prescribed medications, including Lisinopril and Lasix. Filing 9-2 at 14; *See Polaski*, 739 F.2d at 1322. Mia S. also reported the prescribed medications improved her edema. Filing 9-2 at 14. Noting these factors, the ALJ determined the edema was a non-severe impairment because the medical evidence did not reflect that it caused more than minimal functional limitations in her ability to perform basic work tasks. Filing 9-2 at 14.

Regarding Mia S.'s visual limitations, the ALJ thoroughly explained the reasoning behind the limitations when formulating Mia S.'s RFC assessment. In considering Mia S.'s subjective complaints, the ALJ stated the intensity, persistence, and limiting effects of her alleged symptoms were not entirely consistent with the medical records or other evidence in the record. Filing 9-2 at

18. Considering Mia S.'s diabetic retinopathy, the ALJ added "some fairly significant vision limitations" in her RFC, such as limiting her to jobs requiring only occasional precise near acuity and frequent depth perception. Filing 9-2 at 17. The ALJ then noted, however, that even with these visual limitations, the VE found available jobs that Mia S. could perform. Filing 9-2 at 22. Moreover, the ALJ noted that the evidence in the record did not support Mia S.'s subjective complaints to the extent alleged because the medical records showed that her visual acuity was often at 20/30 or 20/40 and the records also showed improvement after surgical treatments. Filing 9-2 at 19-22.

In analyzing the neuropathy-related impairments, the ALJ also determined the intensity, persistence, and limiting effects of her alleged symptoms were not entirely consistent with the medical records or other evidence in the record. Indeed, the ALJ noted that the imaging of the left foot and healed fractures did not demonstrate abnormal findings that would warrant more significant limitations, nor did the evidence reflect ongoing complaints of the left foot. Filing 9-2 at 23. Further, the ALJ added that her diabetes had been generally treated conservatively overall with improvement when Mia S. was compliant with prescribed medications. Filing 9-2 at 19-22. Nevertheless, after extensively assessing the objective and subjective evidence in the record, the ALJ limited Mia S. to no more than the lifting and carrying requirements of light work. Filing 9-2 at 17. The ALJ also included limitations that prevented her from operating a motor vehicle or working around hazards.

In sum, nothing in the record indicates the ALJ did not understand the nature and severity of Mia S.'s medical impairments or that the included limitations were not adequate.[3] The ALJ

---

[3] Mia S. also claims the ALJ failed to consider the severity of her diarrhea and frequent trips to the bathroom. However, the ALJ noted that Mia S. failed to report issues with her diarrhea and frequent bathroom trips during many of her doctor appointments and stated that her symptoms improved with medication. *See Polaski*, 739 F.2d at 1322 (holding that an ALJ may consider the effectiveness of medication in reducing symptoms).

properly considered Mia S.'s subjective complaints of pain and adhered to relevant case law and regulations when formulating her RFC assessment. *See Schwandt*, 926 F.3d at 1012. Therefore, the ALJ's decision is supported by good reasons and substantial evidence. *See Smith*, 756 F.3d at 625.

### 2. The ALJ Fully and Fairly Developed the Record

Mia S. claims that the ALJ erred by not ordering a consultative examination to determine Mia S.'s work limitations due to her visual and diabetes-related impairments. Filing 16 at 25–26. By not doing so, Mia S. asserts the ALJ did not fully and fairly develop the record, rendering the evidence insufficient to support a finding that Mia S. was not disabled.

ALJs have a duty to fully and fairly develop the record. *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010) (citing *Snead v. Barnhart*, 360 F.3d 834, 838 (8th Cir. 2004)). However, "the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.* (citing *Stormo*, 377 F.3d at 806). If the evidence in the record is consistent and sufficient for the ALJ to determine whether a claimant is disabled, the ALJ will make a determination based on that evidence. *See* 20 C.F.R. § 404.1520b(a). "The ALJ does not 'have to seek additional clarifying statements from a treating physician unless a crucial issue is undeveloped.'" *Vossen*, 612 F.3d at 1016 (citing *Stormo*, 377 F.3d at 806). Moreover, "the ALJ is required to order medical examinations and tests only if the medical records presented to him do not give sufficient medical evidence to determine whether the claimant is disabled." *Martise v. Astrue*, 641 F.3d 909, 926–27 (8th Cir. 2011) (citing *Johnson v. Astrue*, 627 F.3d 316, 320 (8th Cir. 2010)).

In the present case, the administrative record contained sufficient evidence for the ALJ to determine Mia S. was not disabled and there was no inconsistency between the medical evidence necessitating further examinations. Mia S. provides no basis for her claim that the ALJ should have

ordered a consultative examination or additional testing, and the Court finds no crucial issues that were underdeveloped or any reason to believe the medical records before the ALJ were insufficient or inconsistent. The ALJ considered all of Mia S.'s treatment records, including the records from her primary care physician, ophthalmologist, and nephrologist. *See* Filing 9-2 at 14-25. The ALJ considered opinion evidence from Mia S.'s primary care physician, a psychological consultative examiner, and State agency medical consultants, along with subjective statements from Mia S. herself. *See* Filing 9-2 at 14-25. Therefore, the ALJ fully and fairly developed the record and there was sufficient and consistent evidence for the ALJ to find Mia S. not disabled as required by SSA regulations. *See* 20 C.F.R. 404.1520b(a). Accordingly, the ALJ had no obligation to order any additional clarifying statements, consultative examinations, or additional testing.

   3.   *The ALJ Properly Carried His Burden at Step Five*

   Mia S. asserts the ALJ failed to resolve apparent conflicts between the VE testimony and DOT. The ALJ limited Mia S. to "occasional, precise near acuity" in her RFC, and the ticket seller, counter clerk, and furniture rental clerk occupations all require "frequent" near acuity, per the DOT. Because the ALJ failed to resolve these apparent conflicts, Mia S. claims the VE testimony does not constitute substantial evidence upon which the ALJ may rely at step five of the sequential evaluation process. The Court concludes that the ALJ failed to resolve apparent conflicts with the counter clerk and furniture rental clerk occupations. However, the ALJ obtained a reasonable explanation for the apparent conflict with the ticket seller occupation and, therefore, substantial evidence supports the ALJ's determination at step five.

   The United States Court of Appeals for the Eighth Circuit has "consistently held that if 'substantial evidence supports the ALJ's phrasing of the hypothetical to the vocational expert, and there was no conflict between the vocational expert's testimony and the DOT, the ALJ properly

relied on the testimony.'" *Courtney v. Comm'r, Soc. Sec. Admin.*, 894 F.3d 1000, 1004 (8th Cir. 2018) (quoting *Moore v. Astrue*, 623 F.3d 599, 604 (8th Cir. 2010)). During an administrative hearing, ALJs have "an affirmative responsibility to ask about 'any possible conflict' between VE evidence and the DOT, and to obtain an explanation for any such conflict, before relying on VE evidence to support a determination the claimant is not disabled." *Welsh v. Colvin*, 765 F.3d 926, 929 (8th Cir. 2014) (citing *Kemp v. Colvin*, 743 F.3d 630, 633 (8th Cir. 2014)). Absent an adequate explanation, "the VE's testimony does not constitute substantial evidence upon which the Commissioner may rely to meet the burden of proving the existence of other jobs in the economy a claimant can perform." *Kemp*, 743 F.3d at 632.

Mia S. argues the ALJ failed to resolve the apparent conflict between the posed hypotheticals and the corresponding occupations provided by the VE per the DOT. The first hypothetical posed by the ALJ limited the hypothetical individual to occupations with "occasional, precise near acuity." Filing 9-2 at 57. In response, the VE stated it would be "pretty limiting" and that the job numbers "would be reduced" with this limitation. Filing 9-2 at 57. The ALJ responded, "if you feel that there are jobs that exist but that the numbers were reduced, then give me the estimate including a reduction in the numbers." Filing 9-2 at 58. The VE provided three jobs: "cleaner" (323.687-014), 220,000 available jobs with a 20% reduction; "ticket seller" (211.467-030), 16,290 available jobs with a 10% reduction; and "advertising materials distributor" (230.687-010), 34,475 available jobs with no reduction needed. Filing 9-2 at 58.

Next, the ALJ posed a second hypothetical that included an additional limitation of "frequent" depth perception and asked the VE if the prior cited occupations would remain. Filing 9-2 at 58. The VE responded that only the ticket seller occupation would remain from the first hypothetical and, as replacements for the other two, provided the jobs of "counter clerk" (249.366-

010), with 9,500 available jobs, and "furniture rental clerk" (295.357-018), with 58,289 available jobs. Filing 9-2 at 58. The ALJ relied on the VE's answer to the second hypothetical, as both limitations from the first and second hypotheticals mirrored those in Mia S.'s RFC. See Filing 9-2 at 17, 26-27. Accordingly, the ALJ concluded at step five that a significant number of jobs exist in the national economy for Mia S., such as a ticket seller, counter clerk, and furniture rental clerk. Filing 9-2 at 26-27.

According to the DOT, the ticket seller, counter clerk, and furniture rental clerk occupations require frequent near acuity, which conflicts with Mia S.'s RFC that limited her to occupations with occasional near acuity. *See 211.467-030 Ticket Seller, Dictionary of Occupational Titles, (4th ed. 1991), 1991 WL 671853; see 295.357-018 Furniture Rental Consultant, Dictionary of Occupational Titles, (4th ed. 1991), 1991 WL 672589; see 249.366-010 Counter Clerk, Dictionary of Occupational Titles, (4th ed. 1991), 1991 WL 672323.* However, after the first hypothetical, the VE specifically provided reduced numbers of available jobs for the ticket seller occupation based on the limitation of occasional near acuity, which is recognized by the Eighth Circuit as a sufficient means of resolving an apparent conflict. *See Jones v. Astrue, 619 F.3d 963, 978 (8th Cir. 2010)* (VE reducing number of available jobs by "10 or 15%" was a sufficient explanation for an inconsistency between his testimony and the DOT). Thus, the apparent conflict with the ticket seller was resolved by the ALJ and the VE's citation of the ticket seller occupation therefore constitutes substantial evidence that the ALJ may rely upon.

Unlike the ticket seller job, however, the ALJ never obtained an explanation for the apparent conflict between the occasional near acuity limitation and the counter clerk and furniture rental clerk occupations. After the ALJ posed the second hypothetical, to which the VE responded that the ticket seller, counter clerk, and furniture rental clerk occupations would be available, the

VE made no mention of a reduction in jobs numbers for the counter clerk or furniture rental clerk occupations, nor did the ALJ further inquire about this apparent conflict. *See* Filing 9-2 at 58-60. Considering the ALJ has the burden of proving that work exists for the claimant at step five, the Court cannot conclude that the ALJ resolved the apparent conflicts with the counter clerk and furniture clerk occupations. *See Goff*, 421 F.3d at 790. Therefore, these two occupations do not constitute substantial evidence that the ALJ may rely upon.

Nevertheless, the ALJ's failure to resolve these apparent conflicts does not warrant reversal because it was harmless. As previously mentioned, the ALJ properly resolved the apparent conflict with the ticket seller occupation when the VE reduced the number of available jobs. Thus, the ALJ could still rely on the ticket seller occupation to find that Mia S. was not disabled. Moreover, the VE testified that 14,080 ticket seller occupations exist in the national economy. The Court finds that substantial evidence supports the ALJ's determination that a significant number of jobs exist in the national economy that Mia S. can perform. *See* 20 C.F.R. § 404.1566; *Palmore v. Saul*, No. 3:18-CV-00084-KGB, 2019 WL 4121985, at *3 (E.D. Ark. Aug. 29, 2019) (citing *Johnson v. Chater*, 108 F.3d 178, 180 (8th Cir. 1997)) (finding substantial evidence supported an ALJ's determination that a significant number of jobs exist where 13,000 jobs were available nationally for the claimant); *see Beckham v. Comm'r, Soc. Sec. Admin.*, No. 4:17-CV-564-DPM-BD, 2018 WL 1511731, at *3 (E.D. Ark. Mar. 27, 2018) (finding the ALJ met his burden where 14,700 jobs were available for the claimant).

### 4.      *The ALJ was Properly Appointed*

Finally, Mia S. argues that former Acting Commissioner Berryhill was without power to appoint the ALJ who adjudicated her case. According to Mia S., under the Federal Vacancies

Reform Act (FVRA), Berryhill's authority as Acting Commissioner ended before she appointed the ALJ in Mia S.'s case.

There is no dispute in this case that the Commissioner of the SSA is a "Head[] of [a] Department[]" and principal officer who must be appointed by the President and confirmed by the Senate under the Appointments Clause of the United States Constitution. *See* U.S. Const. art. II, § 2, cl.2; 42 U.S.C. §902(a). When a principal officer "dies, resigns, or is otherwise unable to perform the functions and duties of the office," the FVRA governs who may serve as an acting head of a department subject to certain time limits. *See* 5 U.S.C. § 3345(a).

Mia S. chiefly argues that Berryhill's authority as Acting Commissioner ended under the FVRA before she appointed the ALJ in Mia S.'s case. When former Acting Commissioner Carolyn Colvin resigned upon the inauguration of President Trump, Berryhill, the Deputy Commissioner for Operations, became the next Acting Commissioner of the FVRA by virtue of President Obama's December 2016 memorandum establishing an order of succession for Social Security officials to become Acting Commissioners under the FVRA. *See Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917, at \*2 (N.D. Iowa July 25, 2022); Presidential Memorandum Providing an Order of Succession Within the Social Security Administration, 81 Fed. Reg. 96337 (Dec. 23, 2016). On March 6, 2018, Berryhill temporarily stepped down as Acting Commissioner. Letter from Thomas H. Armstrong, U.S. Gov't Accountability Off. Gen. Couns., to Donald Trump, U.S. President (March 6, 2018), https://www.gao.gov/assets/b-329853.pdf (reporting that Berryhill's initial service as Acting Commissioner violated the FVRA). Once President Trump nominated Andrew Saul as the Commissioner of Social Security on April 17, 2018, Berryhill resumed her role as Acting Commissioner while Saul's nomination was pending. *See Brian T. D. v. Kijakazi*, No. 19-CV-2542 (DTS), 2022 WL 179540, at \*4 (D. Minn. Jan. 20, 2022). During this

26

second term as Acting Commissioner, Berryhill appointed the ALJ who adjudicated Mia S.'s case.

*See* Filing 16 at 27; Filing 19 at 16. According to Mia S., the FVRA did not allow Berryhill to

resume her role as Acting Commissioner during the pendency of Saul's nomination.

 5 U.S.C. § 3346 imposes time limits on those "serving as an acting officer." *See* 5 U.S.C.

§ 3346(a). The statute provides:

> (a) Except in the case of a vacancy caused by sickness, the person serving as an
> acting officer as described under section 3345 may serve in the office--
>> (1) for no longer than 210 days beginning on the date the vacancy occurs;
>> or
>> (2) subject to subsection (b), once a first or second nomination for the office
>> is submitted to the Senate, from the date of such nomination for the period
>> that the nomination is pending in the Senate.

*Id.* Mia S. argues that, under (a)(1), Berryhill could not serve any longer than 210 days as Acting

Commissioner. Because Berryhill initially served as Acting Commissioner for 210 days after

former Acting Commissioner Colvin resigned, Berryhill could not resume the role of Acting

Commissioner when President Trump nominated Saul as SSA Commissioner. The Commissioner

disagrees, contending that (a)(1) does not proscribe the total amount of time a person may serve

as Acting Commissioner. Instead, the Commissioner argues, (a)(2) is a "spring-back" provision

that allowed Berryhill to resume her role as Acting Commissioner during the pendency of Saul's

nomination and confirmation.

 Mia S. points to a recent case in the District of Minnesota, *Brian T.D. v. Kijakazi*, No. 19-

cv-2542 (DTS), 2022 WL 179540 (D. Minn. Jan. 20, 2022), in support of the proposition that

(a)(2) is not a "spring back" provision. *See Brian T.D.*, 2022 WL 179540 at *11–14 (concluding

that, under § 3346(a), Berryhill was without authority to nominate ALJs during her second term

as Acting Commissioner). In contrast to *Brian T.D.*, however, courts have overwhelmingly

concluded that § 3346(a)(2) allows an individual to serve as an Acting Commissioner beyond the

210 days proscribed by subsection (a)(1) when the President nominates a new Commissioner. *See e.g., Reuter v. Saul*, No. 19-CV-2053-LLR, 2020 WL 7222109, at *15 n.11 (N.D. Iowa May 29, 2020), *report and recommendation adopted sub nom. Reuter v. Comm'r of Soc. Sec.*, No. 19-CV-2053-LRR, 2020 WL 6161405 (N.D. Iowa Oct. 21, 2020); *Thomas S. v. Comm'r of Soc. Sec.*, No. C21-05213-MAT, 2022 WL 268844, at *3 n.2 (W.D. Wash. Jan. 28, 2022). In particular, this Court finds persuasive the analysis of a judge in the Northern District of Iowa in the case *Bauer v. Kijakazi*, No. 21-CV-2008-KEM, 2022 WL 2918917 (N.D. Iowa July 25, 2022). In *Bauer*, the court interpreted the text of § 3346(a)(2) and concluded "that the plain language of the statute authorizes acting service in two instances: during the initial 210 days after a vacancy is created, and while a nomination is pending." *Id.* at *8. The court found that the use of "or" between subsections (a)(1) and (a)(2) did not render them mutually exclusive because typically the word "either," rather than "or," denotes exclusivity between statutory provisions. *Id.* at *7 (citing *Allstate Ins. Co. v. Plambeck*, 66 F. Supp. 3d 782, 788 (N.D. Tex. 2014)). Instead, the court reasoned, the disjunctive "or" in the statute allows one individual to serve during either or both of the periods set out in § 3346(a). *Id.* at *7–8. This Court finds the Northern District of Iowa's interpretation persuasive and adopts it. Accordingly, the Court concludes that Berryhill had the authority under the FVRA to nominate the ALJ that oversaw Mia S.'s case.

### III.   CONCLUSION

The Court concludes that substantial evidence supports the ALJ's decision in Mia S.'s case. Accordingly,

IT IS ORDERED:

1. Mia S.'s Motion for an Order Reverse the Commissioner's Decision, Filing 15, is denied;

2.  Kijakazi's Motion for an order Affirming the Commissioner's Decision, Filing 18, is

     granted;

3.  The Commissioner's decision is affirmed;

4.  Mia S.'s case is dismissed with prejudice; and

5.  The Court will enter a separate judgment.

Dated this 19th day of August, 2022.

BY THE COURT:

_____

Brian C. Buescher
United States District Judge